UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| LORI TABOR,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br><br>    Defendant. | Case No. 19-cv-01291-VKD<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 25, 27 |

Plaintiff Lori Tabor appeals a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 1381, et seq. The parties have filed cross-motions for summary judgment. Dkt. Nos. 25, 27.

The matter was submitted without oral argument. Upon consideration of the moving and responding papers and the relevant evidence of record, for the reasons set forth below, the Court grants Ms. Tabor's motion for summary judgment and denies the Commissioner's cross-motion for summary judgment.[1]

## I.  BACKGROUND

Ms. Tabor seeks disability benefits beginning September 17, 2013. AR 16. She applied for benefits on December 11, 2015. *Id.* Following a hearing, the Administrative Law Judge ("ALJ") issued a decision denying benefits on March 15, 2018. AR 16–21. The ALJ first

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 8, 11.

determined that Ms. Tabor remained insured through December 31, 2013.  AR 16.  The ALJ then found that Ms. Tabor had the following medically determinable impairments: multiple sclerosis ("MS"), cannabis addiction, back pain, and an affective disorder.  AR 18.  However, the ALJ determined that none of these impairments was severe alone or in combination through December 31, 2013.  *Id.*  The ALJ concluded that because Ms. Tabor's symptoms did not result in any functional limitations by the date last insured, she was not disabled.  AR 20–21.

The Appeals Council denied Ms. Tabor's request for review of the ALJ's decision.  AR 1–3.  Ms. Tabor filed this action on March 11, 2019.  Dkt. No. 1.

## II. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits.  The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995).  In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  *Drouin*, 966 F.2d at 1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner.  *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

In determining whether a claimant has a disability within the meaning of the Act, an ALJ follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i) (2012).  If so, the claimant is not disabled.  If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments.  *Id.*

1   § 404.1520(a)(4)(ii).  An impairment is "severe" if it "significantly limits [a claimant's] physical
2   or mental ability to do basic work activities."  *Id.* § 404.1520(c).  If the claimant has a severe
3   medically determinable physical or mental impairment, or a combination of impairments, that is
4   expected to last at least 12 continuous months, he is disabled.  *Id.* §§ 404.1509, 404.1520(a)(4)(ii).
5   Otherwise, the evaluation proceeds to step three.

6   At step three, the ALJ determines whether the claimant's impairment or combination of
7   impairments meets or medically equals the requirements of the Commissioner's Listing of
8   Impairments.  *Id.* § 404.1520(a)(4)(iii).  If so, a conclusive presumption of disability applies.  If
9   not, the analysis proceeds to step four.

10  At step four, the ALJ determines whether the claimant has the residual functional capacity
11  to perform her past work despite her limitations.  *Id.* § 404.1520(a)(4)(iv).  If the claimant can still
12  perform her past work, then she is not disabled.  If the claimant cannot perform her past work,
13  then the evaluation proceeds to step five.

14  At the fifth and final step, the ALJ must determine whether the claimant can make an
15  adjustment to other work, considering the claimant's residual functional capacity, age, education,
16  and work experience.  *Id.* § 404.1520(a)(4)(v).  If so, the claimant is not disabled.

17  The claimant bears the burden of proof at steps one through four.  The Commissioner has
18  the burden at step five.  *Bustamante v. Massanari*, 262 F.3d 949, 953–54 (9th Cir. 2001).

**III.   DISCUSSION**

20  Ms. Tabor contends that the ALJ erred in finding Ms. Tabor's multiple sclerosis was not a
21  severe impairment at step two, and that the ALJ erred in his assessment of Ms. Tabor's credibility
22  in concluding that her multiple sclerosis was non-severe and that she was not disabled prior to her
23  date last insured.

**A.   Step Two: Severity Assessment**

25  "At step two, the ALJ assesses whether the claimant has a medically severe impairment or
26  combination of impairments that significantly limits his ability to do basic work activities."  *Webb*
27  *v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  This step is generally seen as a "de minimis
28  screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir.

3

1996); *see also Buck v. Berryhill*, 869 F.3d 1040, 1048 (9th Cir. 2017) ("Step two is merely a threshold determination meant to screen out weak claims."). Thus, an ALJ should only dismiss claims at this step "when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting S.S.R. 85-28). In evaluating the severity of Ms. Tabor's impairments, the ALJ concluded that Ms. Tabor's multiple sclerosis was not severe based on (1) certain treatment records prior to the date last insured that indicated normal findings upon physical examinations, and (2) the absence of a "work status form" from the administrative record dating before the date last insured. AR 19–20.

"A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself." Social Security Ruling ("SSR")[2] 85-28, 1985 WL 56856, at *4 (1985) (Program Policy Statement; Titles II and XVI: Medical Impairments That Are Not Severe). Here, the ALJ did not discuss any of Ms. Tabor's functional limitations, but relied solely on what he described as her "normal" physical examinations and a medical progress note from Ms. Tabor's neurologist after the date last insured stating that Ms. Tabor was "permanently disabled and unable to work in any meaningful full time capacity." AR 19–20 (citing AR 461, 474, 475, 506, 511, 515, 621, 729–30, 811).

The medical evidence of record does not directly address Ms. Tabor's ability to perform basic work activities, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling. *See* SSR 85-28, 1985 WL 56856, at *3 (stating that "[t]he severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs," and providing examples of basic work activities). Nevertheless, there are some indications in the medical records the ALJ cited that speak to Ms. Tabor's limitations, although the ALJ did not refer to these indications in his opinion.

---

[2] "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

4

For example, the ALJ noted that Ms. Tabor received a positive diagnosis of multiple sclerosis during a visit with her treating neurologist, Dr. John Ribaudo, on September 16,[3] 2013. AR 20 (citing AR 587). In the medical progress note from that same visit, Dr. Ribaudo notes that Ms. Tabor reported "[s]till having pain in left leg and left hand" as well as "[t]rouble walking: spasm in leg, hard to get to store." AR 588. Dr. Ribaudo further states, "See work activity status form for off work or limited duty" and notes that he issued her a "handicapped placard" for six months. AR 594. This evidence suggests that Ms. Tabor had at least some limitations with respect to her ability to walk as of September 16, 2013.

The record also includes a medical progress note from December 16, 2013. AR 20 (citing AR 729–30). As the ALJ acknowledged, in the December 16 note, Dr. Ribaudo reports that Ms. Tabor was "still very dizzy, unsteady" and that she exhibited a "somewhat unsteady" gait. AR 729–30. The December 16 progress note further states: "See work activity status for off work or limited duty: extend disability to 4/16/14." AR 731. This note suggests that Ms. Tabor continued to experience some functional limitations.

In his decision, the ALJ remarked that "the only 'work status' report in the record indicates 'off work' status from June 18, 2014 to October 16, 2014." AR 20 (citing AR 848). On that basis, the ALJ inferred that Ms. Tabor exhibited no functional limitations prior to June 18, 2014. However, this assessment appears to ignore evidence from Dr. Ribaudo's September 16 and December 16, 2013 progress notes in which he records Ms. Tabor's complaints about her ability to walk, and in which he notes a designation of "off work or limited duty" for Ms. Tabor. It also disregards the fact that Dr. Ribaudo apparently issued Ms. Tabor a handicapped placard on September 16, 2013. The ALJ's failure to address this record evidence suggests that he did not consider information bearing on Ms. Tabor's functional limitations in his analysis. "An ALJ may not cherry-pick and rely on portions of the medical record which bolster his findings." *See, e.g.*, *Holohan v. Massanari*, 246 F.3d 1195, 1207–08 (9th Cir. 2001) (holding that an ALJ may not selectively rely on some entries and ignore others "that indicate continued, severe impairment").

---

[3] The ALJ's opinion stated the date of diagnosis was September 16, 2013, but the records to which he cites are dated September 17, 2013. AR 588.

5

The Commissioner argues that the ALJ was not bound by Dr. Ribaudo's opinion of Ms. Tabor's condition. Dkt. No. 27 at 7 n.7. This argument misses the mark. For claims filed before March 27, 2017, such as Ms. Tabor's, medical opinions are defined as "statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1) (2017). Dr. Ribaudo did not provide any medical opinions, but rather only medical progress notes documenting his treatment of Ms. Tabor. *Lowry v. Colvin*, No. 13-cv-03304-NC, 2014 WL 3836224, at *5 (N.D. Cal. July 31, 2014) (physician's treatment notes did not constitute a medical opinion because notes did not contain a subjective assessment of claimant's physical limitations with regard to his ability to perform functional tasks). The ALJ may consider a treating physician's treatment notes, but must consider all of the notes in the context of the medical record as a whole. *See Urban v. Saul*, 808 F. App'x 453, 455 (9th Cir. 2020).

The Commissioner also contends that state agency reviewing physicians found insufficient evidence to establish severity, which is substantial evidence that supports the ALJ's findings. Dkt. No. 27 at 8–9. The ALJ's opinion does not mention the state agency reviewing physicians' conclusions, therefore the Commissioner may not rely on them here to justify the ALJ's error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking."). On remand, the ALJ may wish to consider whether further development of the record is necessary. *See, e.g.*, *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.' The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.")

(internal citations omitted).

Accordingly, because the ALJ failed to consider the medical record as a whole and selectively cited only portions of the record, the Court finds that the ALJ's determination that Ms. Tabor's multiple sclerosis was not severe is not supported by substantial evidence. This error is not harmless because the ALJ did not continue with the five-step analysis. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (any error in failing to find an impairment severe at step two is harmless if the ALJ considers any resulting limitations in assessing a claimant's RFC); SSR 85-28, 1985 WL 56856, at *4 ("If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued."). The Court grants Ms. Tabor's summary judgment motion and denies the Commissioner's summary judgment motion on this issue.

### B.     Assessment of Ms. Tabor's Credibility

In finding that Ms. Tabor is not disabled, the ALJ determined that "the claimant's statements concerning the intensity, persistence, and limiting effects" of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record," based upon treatment records from the relevant time period indicating normal findings upon physical examinations and the absence of a "work status form" from the administrative record dating before the date last insured. AR 19–20. Ms. Tabor argues that the ALJ erred in determining that her hearing testimony was less than fully credible. Dkt. No. 25-2 at 7–10.

In evaluating the credibility of a claimant's testimony regarding subjective symptoms, an ALJ must engage in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 1036 (internal citations and quotation marks omitted). The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (internal quotation omitted). "[O]nce the claimant produces

7

objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity . . . ." *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (internal citation omitted).  At the second step, unless there is affirmative evidence showing that the claimant is malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Smolen*, 80 F.3d at 1282.  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).

The ALJ determined that Ms. Tabor's statements regarding the intensity, persistence, and limiting effects of her symptoms were inconsistent with the medical evidence and other evidence in the record.  AR 19.  In particular, the ALJ appears to have concluded that Ms. Tabor's normal physical examinations in July, August, and September of 2013 did not support the alleged severity of her symptoms.  Because the ALJ did not find that Ms. Tabor was malingering, he was required to provide clear and convincing reasons to justify his rejection of Ms. Tabor's testimony about the severity of her symptoms.  The Court concludes that the ALJ did not meet this standard.

### 1. Objective medical evidence

In considering the objective medical evidence, the ALJ cited the results of Ms. Tabor's MRIs.  AR 20 (citing AR 506, 511).  Her spinal cord MRI results stated: "Nonspecific spinal cord lesions as described.  Focal demyelinating plaque with lead the differential diagnosis given clinical history.  Suggest MRI of the brain further evaluation[.]"  AR 506.  The results of her brain MRI indicated an estimated 15 to 20 "multifocal white matter lesions consistent with demyelinating disease[.]"  AR 510–11.  The record does not reflect whether these MRI results indicate a particular level of severity of Ms. Tabor's condition.[4]  The ALJ expressed no opinion as to whether the objective medical evidence supported Ms. Tabor's alleged severity of symptoms.

---

[4] On January 9, 2014, in response to an inquiry from Ms. Tabor, her neurologist stated: "You have many lesions in your brain and spine: there are too many to count.  Sorry I can't give you an exact number."  AR 741–42.

8

### 2. Medical record evidence

The ALJ appears to have relied on medical records from July 2013, August 28, 2013, September 16, 2013, and December 16, 2013 as containing evidence justifying a decision to discount Ms. Tabor's testimony. However, the ALJ's opinion does not specify exactly which of Ms. Tabor's statements he found not credible. The only mention of any particular statement or testimony is Ms. Tabor's "[description of] difficulties with physical and mental issues in 2015," for which the ALJ cited a function self-report and Ms. Tabor's hearing testimony. AR 19. Ms. Tabor completed a function self-report on January 23, 2016. AR 204–12. It is unclear how her self-reported condition in 2016 and her testimony concerning her condition in 2015 are relevant to whether her multiple sclerosis was severe before December 31, 2013. To the extent the ALJ concluded that Ms. Tabor was not credible based on these much later statements, that conclusion is not based on clear and convincing reasons. An ALJ's credibility findings must be supported by specific, cogent reasons. *See Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *Rashad v. Sullivan*, 903 F.3d 1229, 1231 (9th Cir. 1990).

To the extent the ALJ's conclusion about Ms. Tabor's credibility was based on statements concerning her condition in 2013, Ms. Tabor's hearing testimony regarding that time period appears to be consistent with the medical evidence of record. She described the early stages of her multiple sclerosis:

> A. In the beginning it was my whole left side, and it would cause me not to be able to walk because it would just start acting up or whatever. I don't want to call it but – and that's when I found out that I had MS because I [went] through all this testing. My mother also has MS. It's how my doctor – my neurologist immediately put me in for an MRI. . . .
>
> Q. . . . You said in the beginning your whole left side acted up. Since you've been treated for the multiple sclerosis, has any of that changed in any way?
>
> A. Well, when I first got treated I got the steroids for five days. And I call the steroids the act right juice because they give it to you, and then everything starts acting right. Like I didn't get the feeling in my left side. It was really hard for me to understand that I was actually sick, and I thought, oh, it just went away, now I'm going to be okay. But that's not what happened. It just has progressively gotten worse. The doctor says I have so many lesions you can't count. And things have happened on and off ever since – ever since I was diagnosed.

9

AR 54–55. The medical record evidence (including evidence the ALJ cited) corroborates this testimony. *See, e.g.*, AR 461–62 (July 8, 2013: "Left sided spasm – affects left leg. Left arm tingles. Lasts for less than one minute. Several times daily . . . In order to rule out MS, she would need a brain/neck MRI."); AR 470, 474 (July 11, 2013 medical progress note stating that "she had left sided leg spasm that progressed into weakness, now gradually left arm involved (intermitted from spasm to weakness)," and that she had been experiencing cramps in her left leg and sometimes left arm, with intermittent numbness in her left arm, for the last year, with the problem growing worse over the last month); AR 487 (August 5, 2013 message from Ms. Tabor to Dr. Shahida Malik, stating: "everytime I get up from laying or sitting the spasms happen they last for 25-40 seconds. I can barely walk when it happens, right when I wake up and I go to the restroom I cannot physically pee until the spasm is over"); AR 504 (August 16, 2013 message from Ms. Tabor to Dr. Malik, stating: "I get these crippling cramps every[time] I get up whether it[']s out of my car or up from the couch I get this pain. The pain is from waist down and my upper part of body feels weak when the spasm is happening"); AR 700–01 (October 7, 2013 medical progress note by Dr. Ribaudo stating that Ms. Tabor was "[h]aving a hard time accepting her diagnosis of multiple sclerosis," and "See work activity status for off work or limited duty"); AR 730–31 (December 16, 2013 medical progress note by Dr. Ribaudo stating that Ms. Tabor exhibited dizziness and a "somewhat unsteady gait"); AR 741–42 (January 9, 2014 message from Dr. Ribaudo to Ms. Tabor stating, "You have many lesions in your brain and spine: there are too many to count. Sorry I can't give you an exact number").

Ms. Tabor also described how her condition in 2013 interfered with her ability to work:

> Q. . . .[W]hat MS symptoms, if you know, did you experience from the time you were diagnosed, which was August, September of 2013 until December 31st of 2013? Just that three or four-month period of time.
>
> A. During that time I had – my whole left side of my body didn't work. Like, it was, like – it would work, and then I'd start getting this numbing feeling. And there was times when I'd be walking and it would just – my whole left side I had fallen over at the workplace. They thought I was going to have – or I was having a stroke or something because it was on my left side. But –

> Q. And then, the job that you had at Securitas, why did that job end?
>
> A. Well, I didn't know what was wrong with me, and I kept going to the doctors, and they ended up letting me go because I was missing too much work even though I had doctors' notes for everything."

AR 64.  She further testified:

> A. . . . I feel like that my last job was pretty, you know, not intense or anything and that I couldn't even do that.
>
> Q. And how much were you absent during the last part of your employment, let's say in the course of a month?  . . .
>
> A. I would say give, seven maybe . . . I was, you know, trying to figure out what was wrong with me.  I didn't have any idea.  And –
>
> Q. And from the time you stopped that job until December of 2013, were – did you – what was your most comfortable position at home?
>
> A. Laying in bed.
>
> Q. And how – what percentage of the day were you lying in bed?
>
> A. Probably like 50 or 60.

AR 67–68.  This testimony speaks in part to Ms. Tabor's functional limitations during the relevant time period.  Assuming that the above statements about how her physical symptoms impacted her ability to work during the relevant time period are the ones the ALJ found not credible, the ALJ did not explain how the medical evidence of record makes Ms. Tabor's statements less than credible.

The Court therefore finds that the ALJ did not provide clear and convincing reasons for his disability determination based on Ms. Tabor's medical records and the objective medical evidence.  The Court grants Ms. Tabor's summary judgment motion and denies the Commissioner's summary judgment motion on this point.

## IV. DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)).  On remand, the ALJ must reassess Ms. Tabor's medical record as a whole and provide legally adequate reasons for finding Ms. Tabor's medically determinable

11

impairments severe or not severe.

Based on the foregoing, Ms. Tabor's motion for summary judgment is granted, the Commissioner's cross-motion for summary judgment is denied, and this matter is remanded for further proceedings consistent with this order. The Clerk of the Court shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: September 14, 2020

VIRGINIA K. DEMARCHI
United States Magistrate Judge

12